**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


**GREG A. HAMMER,**

                **Plaintiff,**

    v.                          **Civil Action 2:18-cv-223**
                                 **Judge George C. Smith**
                                 **Magistrate Judge Jolson**


**COMMISSIONER OF**
**SOCIAL SECURITY,**

                **Defendant.**


**REPORT AND RECOMMENDATION**

Plaintiff, Greg A. Hammer, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his Supplemental Security Income and Disability Insurance Benefits. For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

### A.  Prior Proceedings

Plaintiff applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") in December 2014, alleging disability due to a number of physical and mental impairments. (Doc. 8-5, Tr. 372, PAGEID #: 415). Plaintiff alleged an onset date of August 6, 2014. (*Id.*).

After initial administrative denials of Plaintiff's claims, Administrative Law Judge Timothy G. Keller ("the ALJ") heard the case on March 16, 2017. (Doc. 8-2, Tr. 238–56, PAGEID

#: 278–96).  On June 12, 2017, the ALJ issued a decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (Doc. 8-2, Tr. 218–28, PAGEID #: 258–68).  Plaintiff requested a review of the Hearing and the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (Doc. 8-2, Tr. 1–4, PAGEID #: 41–44).

Plaintiff filed this case on March 16, 2018, and the Commissioner filed the administrative record on June 12, 2018.  (Doc. 8).  Plaintiff filed a Statement of Specific Errors on August 6, 2018 (Doc. 10), the Commissioner responded on September 20, 2018 (Doc. 13), and Plaintiff filed a reply (Doc. 14).  Thus, this matter is now ripe for review.

### B.    Relevant Hearing Testimony

At the hearing, Plaintiff testified about his physical and mental issues.  Plaintiff testified that he passes out "three or four times a week, if not more."  (Doc. 8-2, Tr. 243, PAGEID #: 283).  He stated this does not happen when he is sitting, but when he is doing something like washing dishes or sweeping his floor, he's prone to losing consciousness.  (*Id.*)  Plaintiff testified that he has a pacemaker and that he takes medication for his heart and for blood pressure but that the medication has not been able to regulate his blood pressure to keep him from passing out.  (Tr. 244, PAGEID #:  284).  Plaintiff also testified that he has neck, shoulder, and lower back pain.  (Tr. 244–46, PAGEID #: 284–86).

Regarding mental health, Plaintiff testified that he takes medication for depression and anxiety.  (Tr. 246–47, PAGEID #:  286–87).  He stated that he has received counseling at Six County.  (Tr. 247, PAGEID #: 287).  Plaintiff testified that during the day he gets up, tries to eat, and watches television.  He does not visit people or drive much. (Tr. 250, PAGEID #: 290).

As to work history, plaintiff testified that he worked for 15 years as a machine operator. (Tr. 248, PAGEID #: 288). He stated he would stand and walk all day, and lift between 10 and 30 pounds. (Tr. 249, PAGEID #: 289).

During the hearing, a vocational expert ("VE") testified that Plaintiff could perform the unskilled and light positions of housekeeping cleaner, cashier, and sales attendant. (Tr. 253–54, PAGEID #: 293–94).

### C. Relevant Medical Background

The medical records relevant to the disposition of this case are summarized below.

### D. The ALJ's Decision

The ALJ found that Plaintiff remained insured for disability insurance benefits through December 31, 2019, and that he had not engaged in substantial gainful activity since his alleged onset date of August 6, 2014. (Doc. 8-2, Tr. 221, PAGEID #: 261). The ALJ determined that Plaintiff suffered from the following severe impairments: heart condition, syncope, back and neck issues, and left shoulder problems. (*Id.*). Additionally, the ALJ determined that Plaintiff suffered from non-severe impairments, including headaches, depression, and anxiety. (*Id.*).

Upon consideration of the record, the ALJ determined that Plaintiff retained the following residual functional capacity ("RFC") to:

> perform light work … and meaning that the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; able to sit, stand, and walk for 6 hours each in an 8-hour workday; can frequently climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently balance and stoop; can occasionally crawl; and can have no exposure to moving machinery or unprotected heights.

(*Id.*, Tr. 223, PAGEID #: 263).

**II. STANDARD OF REVIEW**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

**III. DISCUSSION**

Plaintiff assigns one error: that the ALJ's decision should be reversed because he violated the treating source rule in his evaluation of Dr. Keith Brantley's medical source statements. More specifically, Plaintiff challenges the ALJ's consideration of Dr. Brantley's opinion concerning Plaintiff's syncope and mental health.

Two related rules govern how the ALJ was required to analyze Dr. Brantley's opinion. *See Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case

record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2). The goal underlying the good reasons rule is two-fold. First, it allows a plaintiff to understand her case, particularly where a plaintiff knows her physician deemed her disabled and thus "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Blakely*, 581 F.3d at 407 (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, "it ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

The good reasons rule requires an ALJ's determination to be supported by the evidence in the case record and "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). Under the good reasons rule, if an ALJ:

> declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source."

*Fletcher v. Comm'r of Soc. Sec.*, 9 F. Supp. 3d 817, 828 (S.D. Ohio 2014) (quoting *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 406.1527(c)(2)–(6) (setting forth the relevant factors). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r*

*of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013); *see also Gayheart v. Comm. of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based the length, frequency, nature, and the extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence."). Defendant argues that the ALJ satisfied the treating physician rule here.

In addition, the Sixth Circuit has held that an ALJ's failure to give good reasons for rejecting the opinion of a treating source may constitute *de minimis* or harmless error in certain circumstances. *Wilson*, 378 F.3d at 547. *De minimis* or harmless error occurs: (1) if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) if the Commissioner has met the goal of the procedural safeguard of the good reasons rule even though an ALJ has not complied with the express terms of the regulation. *Id.* at 547. Defendant alternatively argues that the third exception applies here.

## A. SYNCOPE

On July 16, 2015, Dr. Brantley saw Plaintiff and noted he had a history of palpitations and syncope:

> The patient stated he has been "blacking out" 3-4xs a day and more often if he is doing something strenuous when this happens. He gets lightheaded or dizzy before this occurs before he actually loses consciousness. He also has been having palpitations and chest tightness. He states its worse at night when he is laying down and it usually lasts about 5 mins when it occurs. He stated that the symptoms become more frequent after he was started on a medication the last time he was here (probably florinef). He is always tired and this happens many times right after the stands up. The interrogation of a loop recorder previously paced by Dr. Megeed demonstrated several episodes of bradycardia with heart rates demonstrated in the 30's. . . .

(Doc. 8-2, Tr. 955, PAGEID #: 1001).  Dr. Brantley recommended the placement of a pacemaker.  Plaintiff took the recommendation, and a pacemaker was implanted during the summer of 2015.  (*Id.*).

Later that year, in September of 2015, Dr. Brantley completed a Perry County Employability Form.  (Doc. 8-2, Tr. 572, PAGEID #: 617).  The portion of the form entitled work-related activities was left blank.  Dr Brantley noted, however, that Plaintiff "continues to pass out despite getting a pacemaker."  Along with that form, Dr. Brantley drafted a one-sentence letter, stating:  "Mr. Hammer is still passing out since the pacemaker placement and is unable to work."  (Doc. 8-2, Tr. 571, PAGEID #: 616).  Roughly three months later, Dr. Brantley completed a Medical Source Statement, dated December 18, 2015.  (Doc. 8-2, Tr. 573–75, PAGEID #: 618–20).  That form states that Plaintiff frequently can lift and carry 1–5 pounds, but never more;  frequently can reach and handle with both right and left extremities;  occasionally bend, frequently crouch/squat, frequently crawl, and never climb steps or ladders.  (Doc. 8-2, Tr., PAGEID #: 618–19).  The form also notes that Plaintiff is able to reach above shoulder level, his condition is likely to deteriorate if placed under stress, and he is likely to have more than five unscheduled absences from work per month.  (Doc. 8-2, Tr. 574–75, PAGEID #: 619–20).  Dr. Brantley premised his conclusions on his diagnosis of "[r]ecurrent syncope" and "symptomatic orthostatic hypotension."  Along with that assessment, Dr. Brantley again included a brief letter, stating"  "Mr. Hammer is unable to perform any job that will require standing, due to the possibility that he could pass out at any time."  (Tr. 576, PAGEID #: 621).

In deciding this matter, the ALJ assigned no weight to Dr. Brantley's work-preclusive opinions:

The undersigned assigns no weight to the treating physician's opinion, as it does not merit controlling weight (Keith Brantley, M.D., 9/8/2015, Exhibit 7, and 12/18/2015, Exhibit 8F). [Dr. Brantley] opined that the claimant cannot work due to the possibility that he could pass out at any time following the placement of the pacemaker, but this is a determination that is reserved for the Commissioner. Also, the record shows that he has had syncope since childhood, yet has had a good work history ever since becoming an adult. Additionally, Dr. Brantley did not limit the claimant from being able to drive or carry hunting weapons.

(Doc. 8-2, Tr. 225–26, PAGEID #: 265–66).

Immediately thereafter, the ALJ assigned great weight to the opinion of treating physician,

Dr. Paul Mumma:

On April 16, 2016, [Dr. Mumma] opined that, "This patient is very comfortable with the sick role. I have essentially confronted him with this and also told him that there is no medicine or procedure that is going to deal with his complaints has they are in today. He needs to adapt to his body And become more functional. I strongly advising counseling. Regardless, this patient is capable of sedentary M physical work. His neck problem remains in question He does have a reversal of the cervical lordotic curve and significant tenderness in the occipital area. I will be requesting an MRI. I see no reason to send the pain management at this time" (Exhibit 24F/22). On May 26, 2016, he opined that, "I have told this patient. Equivocal relief that I am unable to come up with an explanation that would account for all of his various complaints. He is clearly doctor shopping. He has been to chiropractors and numerous other practitioners in an attempt to diagnose and/or treat chronic neck pain, headaches, left arm pain, low back pain numbness and tingling in both upper extremities, numbness and tingling in his thighs as well as fatigue and Insomnia. I have told this patient that he is fully employable capable of just about any job duties and has no physical restrictions. I am aware of other than heavy aerobic activity which may cause problems with his paced rhythm. He should do no heavy lifting, pushing or pulling because of his pacemaker module I will be stopping all of his controlled medications." These opinions are consistent with the mostly normal physical examinations throughout the record and the claimant's actions on a daily basis.

(Doc. 8-2, Tr. 226, PAGEID #: 266).

Dr. Mumma's notes, which the ALJ cited, state that Dr. Mumma reviewed Dr. Brantley's

notes and that they "reveal no medical cause" for Plaintiff's syncope. (Tr. 897, PAGEID #: 943).

Dr. Mumma additionally concluded that Plaintiff's dizzy spells "are probably a consequence of

polypharmacy," and consequently stopped Plaintiff's medications. (Tr. 900, PAGEID #: 946).

The undersigned reads the ALJ's opinion as assigning no weight to Dr. Brantley's opinions because they were inconsistent with the record and great weight to Dr. Mumma's opinion because of record support. Specifically, Dr. Brantley's opinion that Plaintiff could pass out at any moment and thus could not work did not comport with other expected limitations of someone who was prone to lose consciousness at any time. In particular, Dr. Brantley expressed no concern about Plaintiff driving or hunting. Similarly, the ALJ appears to have expressed skepticism regarding how limiting syncope is because Plaintiff was diagnosed as a child but since has had a good work history. In contrast, the ALJ stated that Dr. Mumma's opinions were "consistent with the mostly normal physical examinations throughout the record and the claimant's actions on a daily basis." (Doc. 8-2, Tr. 226, PAGEID #: 266).

Considering these factors, the undersigned concludes that the ALJ's rejection of Dr. Brantley's opinion with regard to Plaintiff's syncope was procedurally adequate. Indeed, the Sixth Circuit simply requires that the explanation be enough for the Court to understand the basis for the ALJ's decision. *See Allen v. Com'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (affirming after concluding that ALJ's one-sentence rejection of treating physician's opinion satisfied the "good reasons" requirement). In sum, the ALJ gave sufficient reasons for assigning no weight to Dr. Brantley's opinions.

Moreover, elsewhere in the opinion, the ALJ provided additional analysis of Plaintiff's syncope:

> In regards to his syncope, the record shows there is no apparent medical cause for his syncope (Exhibit 24F/19). Yet, he reported that sometimes when he stands up too fast, he will black out (Exhibit 3E). However, the results of a tilt table test performed on November 26, 2012 were normal (Exhibit 15F/1). Also, the results of a CT Scan of the brain taken on December 1, 2014 showed no radiographic evidence for acute intracranial process (Exhibit 16F/73). Yet, on July 16, 2015, he was seen in consultation for follow-up of palpitations and syncope. He stated he had been "blacking out" 3-4 times a day and more often if he was doing

9

something strenuous. He also had been having palpitations and chest tightness. The integration of the loop recorder previously placed inside of him had demonstrated several episodes of bradycardia with heart rates in the 30's. A pacemaker placement was recommended (Exhibit 25F/45). However, the record shows that he admitted he has had syncope several times since childhood (Exhibit 15F/1). Also, the record shows that he has only positional syncope (Exhibit 25F/14), as vasovagal syncope was ruled out (Exhibit 15F/l).

(Doc. 8-2, Tr. 224, PAGEID #: 264).

Adding this explanation to the equation, the undersigned additionally concludes that even if the discussion of Dr. Brantley's opinion was too light, any error was harmless. The Sixth Circuit's opinion in *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462 (6th Cir. 2006), supports this conclusion. There, the ALJ failed to explain the weight given to two treating physicians. *Id.* at 468. Despite this absence, the Sixth Circuit found that the ALJ's treatment of Plaintiff's impairment "indirectly attack[ed] both the supportability of [the treating sources'] opinions and the consistency of those opinions with the rest of the record evidence." The same is true here. By discussing activities and medical assessments that were inconsistent with Dr. Brantley's opinion, the ALJ adequately discussed reasons why Plaintiff was not as limited as Dr. Brantley opined.

Plaintiff also argues that Dr. Mumma "limited" Plaintiff to sedentary work, referring to the following record:

> [Plaintiff] needs to adapt to his body [a]nd become more functional. I strongly advis[e] counseling. Regardless, this patient is capable of sedentary M[sic] physical work.

(Tr. 900, PAGEID #: 946). Because elsewhere Dr. Mumma opined that Plaintiff could perform any work other than heavy aerobic activity, Plaintiff argues that Dr. Mumma's opinions were internally inconsistent and thus unreliable. (Doc. 14 at 3). First, Plaintiff is overreading Dr. Mumma's opinion regarding sedentary work. To be clear, Dr. Mumma did not expressly limit Plaintiff to sedentary work; he simply noted that Plaintiff could perform sedentary work. Second,

a review of all of Dr. Mumma's records shows that he believes Plaintiff has the ability to perform most jobs. Dr. Mumma reviewed Plaintiff's medical history since 2011, found that he was "doctor shopping," and concluded that Plaintiff was "fully employable[,] capable of just about any job duties and has no physical restrictions[] I am aware of[ o]ther than heavy aerobic activity which may cause problems with his paced rhythm" and "no heavy lifting, pushing or pulling because of his pacemaker module." (Doc. 8-2, Tr. 893, PAGEID #: 939). Indeed, Dr. Mumma directed Plaintiff to "begin progressive daily aerobic exercise." (PAGEID #: 887, Tr. 933). Accordingly, the undersigned finds Plaintiff's argument unpersuasive.

In sum, the ALJ's treatment of Dr. Brantley's opinion regarding Plaintiff's syncope was sufficient. And, in any event, any alleged error was harmless because the ALJ's opinion makes clear why Dr. Brantley's opined limitations were rejected, and substantial evidence supports the ALJ's conclusion.

### B. MENTAL HEALTH

Plaintiff also argues that the ALJ failed to give good reasons for rejecting Dr. Brantley's opined mental limitations. The Perry County Employability Form, described above, is relevant here. In that form, Dr. Brantley checked boxes finding Plaintiff "Not Limited" in his ability to: Remember work location and procedures, Carry out instructions, and Interact with the general public; but "Extremely Limited in his ability to: Maintain attention and concentration; Perform activities within a schedule; and Sustain an ordinary routine." (Doc. 8-2, Tr. 572, PAGEID #: 617). Here is the relevant potion of the form in its entirety:

COGNITIVE SKILLS: Please rate each ability on the following scale & list appropriate accommodations below

Remember work location & procedures       ✓ Not Limited ___ Moderately Limited ___ Markedly Limited ___ Extremely Limited
Carry out instructions                     ✓ Not Limited ___ Moderately Limited ___ Markedly Limited ___ Extremely Limited
Maintain attention & concentration         ___ Not Limited ___ Moderately Limited ___ Markedly Limited ✓ Extremely Limited
Perform activities within a schedule        ___ Not Limited ___ Moderately Limited ___ Markedly Limited ✓ Extremely Limited
Sustain an ordinary routine                ___ Not Limited ___ Moderately Limited ___ Markedly Limited ✓ Extremely Limited
Interact with general public               ✓ Not Limited ___ Moderately Limited ___ Markedly Limited ___ Extremely Limited

(*Id.*). The form contains no narrative explanation of why Plaintiff would be mentally limited in these ways. The other check-box form that Dr. Brantley completed, the Medical Statement Form described above, contains no mental limitations.

Two starting observations. First, it is the undersigned's understanding that Dr. Brantley has no mental health training, and Plaintiff has not told the Court otherwise. Second, besides the check-box form, Plaintiff has not identified any mental health records from Dr. Brantley that would support the opined limitations. To the contrary, Dr. Brantley's notes state that Plaintiff "has a normal mood and affect," his "behavior is normal," "patient is not nervous/anxious," and he is "oriented to person, place, and time." (Tr. 957, PAGEID #: 1003).

The undersigned is reluctant to require an ALJ to articulate reasons beyond what the ALJ did in this case under such circumstances. But regardless, any failure to reject Dr. Brantley's mental health opinions expressly was harmless. This is so because the ALJ elsewhere made clear why Dr. Brantley's expressed mental limitations were too extreme. First, the ALJ explained why he found Plaintiff's mental limitations nonsevere:

> In 2009, [Plaintiff] reported that he became depressed when his biological father passed away (Exhibit 6F/2). His depressive symptoms continued, and in 2015, he reported having crying spells a few times a week (Exhibit 3E) as well as lacking energy and feeling as if he is stuck in tar (Exhibit 2F/5). He also reported of being anxious (Exhibit 6F/3). By 2016, he had gone through a divorce, lost a custody battle for his two children, went through cardiac issues that resulted in pacemaker placement, and felt depressed and traumatized and had problems sleeping due to having nightmares of performing CPR on a neighbor/friend after she passed and seeing images of the corpse (Exhibits 9F/1, 17F/1, and 5, and 24F/7). The record

shows he was prescribed medications in 2013, and has taken medications that include Prozac, Zoloft, Remeron, and Xanax (Exhibits 16F/45, and 24F/10). Yet, the record shows that the results of mental status examinations routinely revealed normal results regarding his mood and affect, and the results of the consultative examination revealed he has no mental limitations that prevent him from working (Exhibits 6F, 21F/4, and 25F/47). Also, in 2015, he reported he was not receiving medication or counseling for his mental issues (Exhibit 3E). For these reasons, these impairments are slight abnormalities, and considered singly and in combination, do not have more than a minimal effect on the claimant's ability to perform basic physical/mental work activities. Therefore, these are non-severe impairments.

In making this finding, the undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.

The first functional area is understanding, remembering, or applying information. In this area, the claimant has mild limitation. The next functional area is interacting with others. In this area, the claimant has mild limitation. The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has mild limitation. The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. He reported he is able to lift 5 pounds, such as a gallon of milk or a sack of potatoes, walk 200 feet at a time, stand and/or walk for 1 hour at a time, has no issues with sitting and can sit for 2 hours at a time, and is able to live in a 2nd-floor apartment, which require use of stairs. He also reported he is able to take care of his personal needs. He reported when he was married that he occasionally cooked and cleaned and performed others tasks, but had to take breaks and his wife had mainly completed the chores when they were still married. Now that he is divorced, he admitted that he is able to perform the tasks and take care of his sons on the weekends when he has them. He continues to drive and use public transportation. He will attend church services, but is prone to withdraw and does not like crowds. He has a few friends. He spends time with his sons and takes them hunting, which is his hobby of his. He will also watch television, read, and use the computer, and has read numerous medical resources to obtain diagnoses for his chronic/minor medical complains (Exhibits 3E, 1OE, 3F, 6F, and 24F).

Again, because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 404.1520a(d)(l) and 416.920a(d)(l)).

(Tr. 221–22, PAGEID #: 261–62).

13

Then, the ALJ explained why he found highly restrictive mental opinions, like Dr. Brantley's opinion, unpersuasive. Specifically, the ALJ relied on Plaintiff's consultative examination with Floyd Sours, MA, which "revealed [Plaintiff] ha[d] no mental limitations that prevent[ed] him from working." (Tr. 221, PAGEID #: 261). The ALJ additionally noted that Plaintiff's mental status examinations "routinely revealed normal results regarding his mood and affect. " (*Id.*). The ALJ also explained that he gave "great weight" to the state agency psychological consultants' opinions. Those consultants concluded that Plaintiff did not have a severe mental impairment and assessed Plaintiff's mental functioning in the four areas as only mildly limited. (*See* Tr. 222, PAGEID #: 262; Tr. 225, PAGEID #: 265). Finally, the ALJ relied on Plaintiff's daily activities. (Tr. 221–22, PAGEID #: 261–62).

In sum, the ALJ's treatment of Dr. Brantley's opinion was sufficient, and substantial evidence supports the ALJ's mental health conclusions.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: November 21, 2018                    /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE